**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ERNEST EDGAR BLACK and          :
AMY ELIZABETH BLACK, a/k/a      :
AMY MERRITT,                    :
                                :
    Plaintiffs,                :          CIVIL ACTION NO.
                                :          1:12-CV-03365-RWS
v.                              :
                                :
SHERIFF JEFF WIGINGTON,         :
ROBERT WILSON, DAVID            :
KAIN, ANDY STAMATELLOS,         :
and TOM EATON,                  :
                                :
    Defendants.                :

## <u>ORDER</u>

This case comes before the Court on Plaintiffs' Motion for Partial

Summary Judgment [43] and Defendants' Motion for Summary Judgment [44].

After reviewing the record, the Court enters the following Order.

### Background

This civil rights action arises out of the arrest and detention of Plaintiffs

Ernest Edgar Black and Amy Merritt after Defendants attempted to execute an

arrest warrant for a third party, William Lynn Wilson, at Plaintiffs' residence.

Plaintiff Black also brings claims for inadequate medical care and

AO 72A
(Rev.8/82)

discrimination under the Americans with Disabilities Act ("ADA") related to his confinement in the Rockdale County Jail.

Around 4:30 p.m. on August 14, 2010, Deputies David Kain and Andy Stamatellos of the Rockdale County Sheriff's Office attempted to serve an outstanding probation warrant for Wilson at his last known address, 1651 River Circle, Conyers, Georgia.  (Defs.' Statement of Material Facts ("SMF"), Dkt. [44-2] ¶¶ 1-2.)  When the deputies arrived at the address, they found a dilapidated trailer sitting at the end of a gravel driveway on top of a hill, surrounded by trees and brush.  (Defs.' SMF, Dkt. [44-2] ¶¶ 3-4.)  Deputies Kain and Stamatellos did not see a vehicle or bicycle in the driveway but knew Wilson did not own a car or ride a bike.  (Id. ¶ 5.)  The deputies knew Wilson and knew he could not hold down employment because, according to Kain, Wilson was not "a real functioning member of society."  (Kain Depo., Dkt. [43-13] at 19:7-11.)  The deputies approached the front door of the trailer, knocked, and announced that they were sheriff's deputies, but no one answered.  (Defs.' SMF, Dkt. [44-2] ¶ 6; Kain Incident Report, Dkt. [43-8] at 1.)  The deputies peered through the screens of the open windows as they walked around to the back of the trailer.  (Id.)  They saw no movement inside except for two dogs

2

who were barking from their cages.  (Kain Incident Report, Dkt. [43-8] at 1.)

They also observed a solar shower outside.  (Defs.' SMF, Dkt. [44-2] ¶ 9.)

When they got to the back door of the trailer, Kain and Stamatellos saw

that the back door's window was open and the screen over the window was

torn.  (Id. ¶ 10.)  The deputies believed the screen was torn in a manner

consistent with a burglary and thought it was possible someone had broken in.

(Id. ¶¶ 11-13.)  The deputies then decided to enter the home, checking for both

Wilson and a possible burglary suspect.  (Id. ¶ 15.)  In conducting a protective

sweep, Kain and Stamatellos saw in plain view marijuana, a pill bottle with

marijuana seeds and a pill bottle with marijuana roaches, a pile of clothing that

appeared to belong to the Rockdale County Sheriff's Office, and several bullet-

proof vests.  (Id. ¶¶ 16-17.)

After clearing the trailer and realizing that nobody was inside, Kain and

Stamatellos called for a supervisor and went back outside.  (Id. ¶ 18.)  Shortly

thereafter, Plaintiffs Black and Merritt arrived at the trailer and asked why the

deputies were there.  (Id. ¶ 20.)  Black then advised the deputies that he suffered

from a seizure disorder, requested an ambulance, and was taken to the Rockdale

3

Medical Center where he was evaluated for an hour and a half before being discharged.  (<u>Id.</u> ¶¶ 21-22.)

In the meantime, Investigator Robert Wilson arrived at the trailer, took pictures of it, advised the deputies not to enter the residence, and left to obtain a search warrant.  (<u>Id.</u> ¶ 24.)  Wilson returned to the trailer with a search warrant around 7:20 p.m.  (<u>Id.</u> ¶ 25.)  Plaintiffs insist that Defendants' entry into their trailer was unlawful and, moreover, Wilson failed to tell the magistrate judge when he was applying for the search warrant that Defendants had entered the home without a warrant.  (<u>See</u> Pls.' SMF, Dkt. [43-1] ¶ 19.)

Defendants searched the trailer, recovered a substantial amount of marijuana, and arrested Merritt.  Black was also arrested when he returned from the hospital.  Plaintiffs were taken to the Rockdale County Jail that evening, August 14, 2010.  Arrest warrants were issued the next day.  (<u>See</u> Warrants, Dkt. [43-5, 43-6].)  A few days later, while he was in jail Black fell and injured his hip, leg, left ulna, and back.  (Pls.' SMF, Dkt. [43-1] ¶ 1.)  A deputy came to Black's attention, and Black complained as he lay on the floor that the back of his head hurt and his foot was tingling.  (Defs.' SMF, Dkt. [44-2] ¶ 33.)  The deputy told Black to stay still as they waited for help to arrive.  (<u>Id.</u>)  Black was

4

taken to the Rockdale Medical Center again and was discharged later that evening.  (Id. ¶¶ 33-34.)

After this injury, the medical staff placed Black in a holding cell in the booking area for most of the time he was in jail rather than with the rest of the jail population in the dorms.  (Pls.' SMF, Dkt. [43-1] ¶ 2; Jones Depo., Dkt. [43-11] at 17:9-13.)  The medical unit apparently used certain booking cells for inmates who were going to be in the medical unit for "a long period of time." (See Jones Depo., Dkt. [43-11] at 13:15-14:6.)  Black's cell lacked a TV, and he slept on either a concrete slab or a hard, plastic "boat" on which inmates could place the standard mattresses they were issued.  (Id. at 16:13-15; Pass Depo., Dkt. [43-14] at 34:16-35:1.)  According to Black, because he was confined to the holding cell, he was denied privileges that the general population in the dorms were permitted to enjoy, such as television, exercise, and being able to walk around the dorm area.  (See Pls.' SMF, Dkt. [43-1] ¶ 7.)  Black also had to ask to be let out to shower, whereas inmates in the dorm area could shower without first getting a deputy's permission.  (See Pass Depo., Dkt. [43-14] at 59:6-25.)  Moreover, the lights in the booking area where Black stayed were on 24 hours per day and were never dimmed.  (Id. at 48:23-49:2.)  Black's

incarceration lasted from August 14, 2010, until September 27, 2010, during which he was seen by a medical provider nearly every day, sometimes two or three times daily.  (Defs.' SMF, Dkt. [44-2] ¶ 37.)

Eventually, in December 2011 the Superior Court of Rockdale County suppressed the evidence obtained at the trailer, ruling that the initial entry "was in violation of the Fourth Amendment."  (Superior Court Order, Dkt. [43-4] at 2.)  The court reasoned that the deputies had no evidence Wilson was in the trailer because they did not see or hear anyone in the residence or see a vehicle parked outside.  (Id.)  Furthermore, the court found that exigent circumstances were lacking because the officers did not hear or observe any activity leading them to believe someone was committing a burglary, and the torn screen did not indicate as much because the entire trailer was in disrepair.  (Id.)  The charges against Plaintiffs were subsequently dismissed.  (Defs.' SMF, Dkt. [44-2] ¶ 39.)

Plaintiffs filed this action under 42 U.S.C. § 1983 and the ADA based on Defendants' entry of their home, their arrest, and Black's treatment while in custody.  Plaintiffs sue Sheriff Jeff Wigington, Investigator Wilson, Deputy Kain, Deputy Stamatellos, and jail officials Tom Eaton, Bernice Louise Jones, and Dennis Pass.  Plaintiffs later voluntarily dismissed Defendants Jones and

Pass.  Plaintiffs allege the following claims: (1) illegal entry of Plaintiffs' home

without a warrant or exigent circumstances in violation of the Fourth

Amendment against Sheriff Wigington, Deputies Kain and Stamatellos, and

Investigator Wilson in their individual capacities (Count One); (2) malicious

prosecution in violation of the Fourth Amendment against Investigator Wilson

and Deputies Kain and Stamatellos in their individual capacities (Count Two);

(3) false imprisonment under Georgia law against Deputies Kain and

Stamatellos in their individual capacities (Count Three); (4) compensatory and

punitive damages for Defendants' intent to do Plaintiffs harm (Count Four); (5)

trespass under Georgia law against Deputies Kain and Stamatellos in their

individual capacities (Count Five); (6) disability discrimination in violation of

the ADA against Sheriff Wigington in his official capacity (Count Six); and (7)

denial of adequate medical treatment in violation of the Fourteenth Amendment

against Sheriff Wigington and Eaton in their individual capacities (Count

Seven).[1]  The remaining Defendants move for summary judgment on all claims,

---

[1]Although Defendants, in moving for summary judgment, initially identified
claims brought against them in their official capacities, upon reviewing the Complaint
and Plaintiffs' responses, it appears that Plaintiffs bring claims against the Defendants
listed herein in their individual capacities except under Count Six, which Plaintiffs
bring against Sheriff Wigington in his official capacity.  As such, the Court does not

and Plaintiffs move for partial summary judgment on issues of liability but not official immunity and damages.

## Discussion

### I.    Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' "  <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and

---

address Defendants' arguments related to municipal liability and sovereign immunity under Georgia law.

present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met

9

its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## II.    Statute of Limitations Issues

Defendants first raise a statute of limitations defense, asserting that claims arising from Plaintiffs' arrests should be dismissed as time-barred.  (See Defs.' Br., Dkt. [44-1] at 18-19.)  The Georgia two-year statute of limitations for personal injury actions applies to actions brought under 42 U.S.C. § 1983 when the relevant events occurred in Georgia.  O.C.G.A. § 9-3-33; Williams v. City of Atlanta, 794 F.2d 624, 625-26 (11th Cir. 1986).  A limitations period begins to run when a cause of action accrues, and "[f]ederal law determines when a federal civil rights claim accrues."  Rozar v. Mullis, 85 F.3d 556, 561 (11th Cir. 1996).  The statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.  Id. at 561-62.  This means a plaintiff must know or have reason to know that he was injured, and must be aware or should be aware of who inflicted the injury.  Id.

In support of their argument, Defendants point out that they entered Plaintiffs' trailer and arrested them on August 14, 2010, but Plaintiffs filed this

10

suit on September 26, 2012—over two years after their arrests.  Therefore, Defendants assert that any causes of action that accrued on August 14, 2010, are time-barred.  The relevant claims arising from the arrests are: illegal entry of Plaintiffs' home in violation of the Fourth Amendment (Count One), malicious prosecution in violation of the Fourth Amendment (Count Two), and false imprisonment under Georgia law (Count Three).

Count One is based on the initial entry into Plaintiffs' home and the seizure of Plaintiffs before obtaining an arrest warrant on allegedly false information.  Plaintiffs concede "that the initial warrantless arrest of both plaintiffs is barred by the statute of limitations under federal law."  (Pls.' Resp., Dkt. [49] at 9.)  Indeed, because the cause of action for both the search and seizure accrued on August 14, Count One is barred by the two-year statute of limitations.

Besides the initial warrantless arrest, Plaintiffs bring a malicious prosecution claim under Count Two based on the alleged unlawful arrests pursuant to a warrant.  Plaintiffs also argue that the malicious prosecution claim did not accrue—and thus the statute of limitations did not begin to run—until

11

the criminal prosecution ended.  (Id.; Pls.' Br., Dkt. [43-2] at 21-22.)  Plaintiffs

are correct that

> where a section 1983 plaintiff is seized following the institution of
> a prosecution (for example, after a warrant has been issued for
> arrest or after an information has been filed) and he seeks to
> recover damages for all the elements of the prosecution, he can
> properly wait until the prosecution terminates in his favor to bring
> his section 1983 claim which alleges that the seizure was
> unreasonable.

Whiting v. Traylor, 85 F.3d 581, 585 (11th Cir. 1996).  Because the charges

against Plaintiffs were dropped in December 2011, their malicious prosecution

claim accrued less than two years before they filed suit in September 2012.

Therefore, that claim is timely.

In Count Three, Plaintiffs allege, "When these defendants detained

plaintiffs while defendant Wilson went to get a search warrant and then took the

plaintiffs to jail, they accomplished the tort of false imprisonment."  (Pls.' Br.,

Dkt. [43-2] at 22.)  Under Georgia law, "[f]alse imprisonment is the unlawful

detention of the person of another, for any length of time, whereby such person

is deprived of his personal liberty."  O.C.G.A. § 51-7-20.  Plaintiffs contend

that the statute of limitations on their false imprisonment claim was tolled until

they were released from custody on September 27, 2010.  (Id. at 23.)

12

The Court must first clarify Georgia law's distinction between false imprisonment, false arrest, and malicious prosecution.  The essential element of a claim for false imprisonment under Georgia law is a detention without legal process.  Ferrell v. Mikula, 672 S.E.2d 7, 10 (Ga. Ct. App. 2008).  Thus, Georgia law treats false arrest and false imprisonment as separate and distinct torts.  Id.  "An arrest 'under process of law' is an arrest made pursuant to a warrant[,] and the key distinction between [false] arrest and false imprisonment under [Georgia law] is whether the person was detained using a warrant or not."  Id.  Plaintiffs argue that they were falsely imprisoned while Wilson obtained a search warrant and then took Plaintiffs to jail.  Even so, Defendants obtained an arrest warrant for Plaintiffs the following day, on August 15, 2010.  (See Warrants, Dkt. [43-5, 43-6].)  That being the case, the tort of false imprisonment *without legal process* lasted until Defendants obtained arrest warrants on August 15, not until September 27 when they were released.  By August 15, Plaintiffs were held pursuant to legal process, and thus the relevant torts were false arrest or malicious prosecution.  See Ferrell, 672 S.E.2d at 10 (distinguishing between false imprisonment, which is "unlawful detention without judicial process, or without the involvement of a judge at any point";

13

false or malicious arrest, which is "detention under process of law"; and

malicious prosecution, "which is detention with judicial process followed by

prosecution").

Even though Plaintiffs were no longer falsely imprisoned after August

15, 2010, they attempt to save their claim by arguing that they suffered a

continuous tort until their release on September 27.  Plaintiffs cite <u>Hicks v.</u>

<u>McGee</u>, 642 S.E.2d 379 (Ga. Ct. App. 2007), in which the Georgia Court of

Appeals held that the continuing tort doctrine applied to the plaintiff's

negligence claim against the Fulton County Superior Court Clerk.  In <u>Hicks</u>, the

defendants neglected to notify the Department of Corrections of the plaintiff's

sentence, which resulted in the plaintiff serving an additional 22 months in

prison after his sentence had expired.  <u>Id.</u> at 381.  The defendants raised a

statute of limitations defense, arguing that the statute of limitations began to run

on the first day the plaintiff was held in confinement beyond his sentence, May

27, 2001.  <u>Id.</u>  Because the plaintiff did not file suit until October 1, 2003, the

defendants argued that the claim was time-barred.  <u>Id.</u>  The court of appeals

disagreed, holding that the continuing tort doctrine applied because the

defendants violated their continuing duty to communicate the plaintiff's

14

sentence to the Department of Corrections, resulting in continuous injury until he was released on March 5, 2003.  Id.

The circumstances here are distinguishable because the false imprisonment claim lasted only so long as Plaintiffs were held without a warrant.  Because Georgia law distinguishes the tort of false imprisonment from the torts of false arrest and malicious prosecution, it is evident that Plaintiffs did not suffer a continuing tort of false imprisonment once they were held pursuant to a warrant.  Consequently, Plaintiffs' claim for false imprisonment (Count Three) is barred by the statute of limitations.  For these reasons, Defendants' Motion for Summary Judgment [44] is **GRANTED** and Plaintiffs' Motion for Summary Judgment [43] is **DENIED** as to Counts One and Three.

## III.   Section 1983 Claims

The Court now turns to Plaintiffs' § 1983 claims for malicious prosecution and denial of medical care.  Defendants assert that they did not violate Plaintiffs' constitutional rights and that they are entitled to qualified immunity.

### A.   Qualified Immunity

The doctrine of qualified immunity protects government officials

15

performing discretionary functions from being sued in their individual capacities. Wilson v. Layne, 526 U.S. 603, 609 (1999). Officials are shielded "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." Cottone v. Jenne, 326 F.3d 1352, 1357 (11th Cir. 2003). Once the government official has satisfied this initial burden, the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity. Id. at 1358. The Court finds that Defendants were acting in their discretionary authority by attempting to execute an arrest warrant; therefore, it is Plaintiffs' burden to show that they are not entitled to qualified immunity.

Whether an official is entitled to qualified immunity is determined by a two-step inquiry: One inquiry is "whether the plaintiff's allegations, if true, establish a constitutional violation." Barnett v. City of Florence, 409 F. App'x 266, 270 (11th Cir. 2010) (citing Hope v. Pelzer, 536 U.S. 730, 736 (2002)). "If the facts, construed . . . in the light most favorable to the plaintiff, show that a constitutional right has been violated, another inquiry is whether the right

16

violated was 'clearly established.' " Id. (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  "Both elements of this test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case." Id. (citing Pearson v. Callahan, 555 U.S. 223, 241 (2009)).

      B.      Malicious Prosecution under the Fourth Amendment (Count Two)

"To establish a federal malicious prosecution claim under § 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable seizures in addition to the elements of the common law tort of malicious prosecution." Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003). The elements of the common law tort of malicious prosecution are: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." Id. at 881-82 (citation omitted).  Thus, where probable cause exists for an arrest, a subsequent claim for malicious prosecution will fail as a matter of law.  See, e.g., Brock v. City of Zephyrhills, 232 F. App'x 925, 928 (11th Cir. 2007) ("The absence of probable cause is a necessary element for a claim of malicious prosecution. . . .  Because

17

probable cause existed for [the plaintiff]'s arrest, his claim of malicious prosecution fails.").

Defendants do not separately address this claim in their brief, but they do argue that they had probable cause to arrest Plaintiffs.  If they did, Plaintiffs' malicious prosecution claim fails.  Their argument turns on whether their initial entry into Plaintiffs' trailer was reasonable.  Defendants insist that their entry into the home was reasonable given that they (1) had a valid arrest warrant for a third person they believed resided there and (2) believed a burglary had occurred or was in progress.  Plaintiffs argue that probable cause was lacking because Defendants illegally entered their trailer and then obtained a search warrant based on the illegal entry.

While warrantless searches and seizures inside a home are presumptively unreasonable, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980).  The Eleventh Circuit has established a two-part inquiry under Payton to determine if an entry pursuant to an arrest warrant is reasonable under the Fourth Amendment.  "[F]irst, there must be a reasonable belief that the

18

location to be searched is the suspect's dwelling, and second, the police must have 'reason to believe' that the suspect is within the dwelling." United States v. Magluta, 44 F.3d 1530, 1533 (11th Cir. 1995).  The Eleventh Circuit has further explained that

> for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry.

Id. at 1535.  Moreover, "courts must be sensitive to common sense factors" in evaluating both Payton prongs.  United States v. Bervaldi, 226 F.3d 1256, 1263 (11th Cir. 2000).

Under the first prong, Defendants assert that it was reasonable to believe Wilson lived at the trailer because the probation arrest warrant contained the trailer's address.  Indeed, Wilson would have likely provided information about his residence while under supervision.  Officers responsible for executing a probation arrest warrant would reasonably believe the individual lives at the address he provided.

19

As for the second prong, Defendants insist that they had a reasonable belief that Wilson was in the dwelling at the time of entry.  Defendants emphasize a few key facts to support their belief: (1) there was no car at the trailer, and they knew Wilson did not own a car; (2) Wilson was unemployed and so could be expected to be at home; (3) it appeared that someone was living at the trailer because there was a solar shower outside; and (4) dogs were barking inside, meaning someone could have been home.

Viewing these facts in the light most favorable to Plaintiffs, the Court cannot find that Defendants had a reasonable belief that Wilson was inside the trailer at the time they entered.  First, even though Defendants knew Wilson did not have a car, the absence of a car indicated nothing, unlike in cases where the presence of a car indicated an individual was likely home.  See, e.g., Magluta, 44 F.3d at 1535-36 (stating that it is reasonable to believe a person is at home when his car is parked at the property); Bervaldi, 226 F.3d at 1262-63 ("The fact that vehicles were parked at the residence only buttresses the belief that persons were at the house, including presumably [the individual named in the arrest warrant].").  Just because Defendants would not have expected to see a

20

car if Wilson was home does not mean the absence of a car indicated it was likely Wilson was there.

Defendants next state that they reasonably believed Wilson was there because Wilson was unemployed and was likely to be home.  Courts have held that "officers may presume that a person is at home at certain times of day." Magluta, 44 F.3d at 1535.  For example, it is reasonable to believe a suspect would be "at his place of abode, especially at 8:30 in the morning for a man not known to be working."  United States v. Woods, 560 F.2d 660, 665 (5th Cir. 1977)[2]; see also Bervaldi, 226 F.3d at 1267 ("It was reasonable to believe, in the absence of contrary evidence, that [the suspect] would be at his residence at 6:00 in the morning.").  Here, the deputies arrived at the trailer around 4:30 p.m.  Unlike cases where officers presumed a suspect was at home early in the morning, especially if unemployed, here Defendants do not explain why Wilson was more likely to be at home at 4:30 p.m. as opposed to other times of day. Although Wilson was unemployed, Defendants cite no cases holding that it is reasonable to presume a suspect is at home at that time of day.  Viewing the

---

[2]The Eleventh Circuit has adopted as binding precedent all decisions of the former Fifth Circuit decided before October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

evidence in the light most favorable to Plaintiffs, this evidence standing alone does not support a reasonable belief that Wilson was at the trailer.

For the third and fourth pieces of evidence, Defendants note that they heard dogs barking in the trailer and observed a solar shower outside. Defendants insist that the dogs could have been barking because Wilson was inside. Construing the facts in Plaintiffs' favor, however, it is more likely the dogs were barking because the deputies had just pulled up and approached the trailer, not because the occupant was home. And while the solar shower indeed suggested that someone was likely inhabiting the dilapidated trailer, it provided no evidence that Wilson was actually there at that time. Considering these circumstances, the Court finds that Defendants fail to show that they had a reasonable belief that Wilson was in the trailer when they entered it. Furthermore, the Court finds that the law related to entries pursuant to arrest warrants was clearly established at the time of Defendants' actions. See Magluta, 44 F.3d at 1533. Viewing the facts in favor of Plaintiffs, it was clearly established that Defendants were not justified in entering the dwelling when they lacked a reasonable belief that a suspect was inside.

22

Even so, Defendants also justify their entry by contending that they believed a burglary had taken place or was in progress.  An officer may enter a home without a warrant when "exigent circumstances" exist; that is, in "situations in which 'the delay incident to obtaining a warrant must give way to an urgent need for immediate action.' " <u>McClish v. Nugent</u>, 483 F.3d 1231, 1240 (11th Cir. 2007).  "The exigent circumstances exception to the fourth amendment warrant requirement applies in 'those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate.' " <u>United States v. Blasco</u>, 702 F.2d 1315, 1325 (11th Cir. 1983) (citations and internal quotation marks omitted).  Exigent circumstances exist where, for example, an officer enters "to break up a violent fight, to prevent the destruction of evidence, to put out a fire in a burning building, to pursue a fleeing suspect, to rescue a kidnapped infant, [or] to attend to a stabbing victim." <u>McClish</u>, 483 F.3d at 1240-41 (citations omitted).  When an officer conducts a warrantless search or seizure inside a home, he "bears the burden of proving that his conduct was justified." <u>Id.</u> at 1241.

23

Defendants' only evidence of a burglary was the torn screen on the back door, which they say was torn in a manner consistent with a burglary, and the fact that the dogs were barking.  On the other hand, Defendants also observed that the trailer was in a state of disrepair.  Having reviewed the evidence, including photos of the torn screen, (see Defs.' SMF, Dkt. [44-2] ¶ 10) the Court finds that a genuine dispute of material fact exists as to whether it was reasonable to believe exigent circumstances justified a warrantless entry. Viewed in a light favorable to Plaintiffs, it is not surprising that a screen would be torn on the door of a dilapidated home.  And once again, the fact that dogs were barking is slim evidence that a burglary was taking place considering Defendants had approached the trailer, knocked, and announced their presence, likely exciting the dogs.  Given the lack of evidence of a burglary, the Court cannot say as a matter of law that it was reasonable to believe exigent circumstances existed.  Furthermore, the Court finds that it was clearly established that Defendants could not enter the trailer absent exigent circumstances.  See McClish, 483 F.3d at 1240-41.

For these reasons, the Court finds that Defendants fail to show they were justified in entering the trailer either pursuant to an arrest warrant or because of

24

exigent circumstances.  Defendants do not dispute the other elements of

malicious prosecution.  As such, Defendants' Motion for Summary Judgment

[44] is **DENIED** as to Count Two.

As for Plaintiffs' Motion for Partial Summary Judgment [43], the Court

finds that genuine disputes of material fact discussed above also exist when

viewing the evidence in the light most favorable to Defendants.  Consequently,

Plaintiffs' Motion for Partial Summary Judgment [43] is also **DENIED** as to

Count Two.

B.      Inadequate Medical Care under the Fourteenth Amendment (Count
        Seven)

Plaintiff Black alleges that Defendants were deliberately indifferent to a

serious medical need while he was in custody, thereby violating his Fourteenth

Amendment rights.  Defendants note that Plaintiff has voluntarily dismissed the

jailers from this action, leaving only Sheriff Wigington and Tom Eaton as

Defendants on this claim.  Defendants argue there is no evidence that either

Wigington or Eaton knew about Plaintiff Black's medical condition or were

deliberately indifferent to it.  Furthermore, they state that Plaintiff Black

received medical attention from a contract medical provider nearly ever day he

25

was incarcerated.  Plaintiffs do not contest these arguments and expressly

concede this claim.  (See Pls.' Resp., Dkt. [49] at 18 n.8.)  As such, Defendants'

Motion for Summary Judgment [49] is **GRANTED** as to Count Seven.

Because this was the only claim against Defendant Eaton, he is hereby

**DISMISSED** from this action.

## IV.   Trespass under Georgia Law (Count Five)

Plaintiffs allege that Defendants interfered with the enjoyment of their

property, constituting a trespass.  (Compl., Dkt. [1] ¶ 48.)  See O.C.G.A. § 51-9-

1.  As Plaintiffs note, a trespass claim is subject to a four-year statute of

limitations, so this claim is not time-barred.  See O.C.G.A. § 9-3-30(a) ("All

actions for trespass upon or damage to realty shall be brought within four years

after the right of action accrues.").  Even so, Defendants argue that they are

entitled to official immunity under Georgia law.

The state constitutional provision governing official immunity provides:

[A]ll officers or employees of the state or its departments and
agencies may be subject to suit and may be liable for injuries and
damages caused by the negligent performance of, or negligent
failure to perform, their ministerial functions and may be liable for
injuries and damages if they act with actual malice or with actual
intent to cause injury in the performance of their official functions.
Except as provided in this subparagraph, officers and employees of

26

> the state or its departments and agencies shall not be subject to suit
> or liability, and no judgment shall be entered against them, for the
> performance or nonperformance of their official functions.

GA. CONST. art. I, § 2, ¶ 9(d).  The Supreme Court of Georgia has held that the

term "official functions" refers to "any act performed within the officer's or

employee's scope of authority, including both ministerial and discretionary

acts."  Gilbert v. Richardson, 452 S.E.2d 476, 483 (Ga. 1994).  Accordingly,

under this definition, the constitutional provision "provides no immunity for

ministerial acts negligently performed or for ministerial or discretionary acts

performed with malice or an intent to injure."  Id.  "It, however, does provide

immunity for the negligent performance of discretionary acts . . . ."  Id.  In sum,

under Georgia law, "a public officer or employee may be personally liable only

for ministerial acts negligently performed or discretionary acts performed with

malice or intent to injure."  Harvey v. Nichols, 581 S.E.2d 272, 276 (Ga. Ct.

App. 2003).  While official immunity is a question of law that the court must

decide, "when the relevant facts concerning the [officer's] behavior at the time

of the alleged tort are in dispute, the court cannot resolve the factual issues on a

motion for summary judgment."  Nichols v. Prather, 650 S.E.2d 380, 387 (Ga.

AO 72A
(Rev.8/82)

Ct. App. 2007).  Rather, a jury must first resolve the factual disputes before the court can decide whether an officer is entitled to official immunity.  Id.

As a threshold matter, the Court finds that Defendants were performing discretionary acts in attempting to serve an arrest warrant.  Consequently, to defeat official immunity Plaintiffs must show that Defendants acted with actual malice in entering the trailer.  For purposes of official immunity, " 'actual malice' requires a deliberate intention to do wrong, and denotes express malice or malice in fact.  It does not include willful, wanton or reckless conduct or implied malice."  Daley v. Clark, 638 S.E.2d 376, 386 (Ga. Ct. App. 2006).  "A 'deliberate intention to do wrong' such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs."  Murphy v. Bajjani, 647 S.E.2d 54, 60 (Ga. 2007).

Defendants assert they could not have acted with actual malice because when they entered Plaintiffs' trailer, they did not even know that Plaintiffs lived there; rather, Defendants believed it was Wilson's residence.  Thus, Defendants did not have the specific intent to harm these Plaintiffs.  Plaintiffs respond that there are factual issues as to whether Defendants acted with actual malice, arguing that "[a] jury could find that they knew plaintiffs' home was not to be

28

searched" but entered anyway and then obtained a search warrant based on information obtained from that entry.  (See Pls.' Resp., Dkt. [49] at 16.)

As the Court found above, viewing the evidence in the light most favorable to Plaintiffs, there is evidence from which a jury could conclude that Defendants lacked exigent circumstances to enter Plaintiffs' trailer.  A jury could find that Defendants then used the information obtained from the unlawful entry to obtain a search warrant and thus continued their trespass on the property.  Under this set of facts, a jury could also conclude that Defendants entered the trailer even though they knew they had no justification for doing so. In Bateast v. DeKalb County, for instance, the Georgia Court of Appeals held that a jury could find the defendant officers "proceeded in their arrest of [the plaintiff] despite their knowledge that she had not committed the crimes for which they accused her, thereby deliberately intending to do a wrongful act." 572 S.E.2d 756, 758 (Ga. Ct. App. 2002).  For that reason, the court reversed the trial court's grant of summary judgment in favor of the defendants.  Id. Similarly, in City of Atlanta v. Shavers, the Georgia Court of Appeals affirmed the trial court's denial of summary judgment to the defendant officer, holding that under the plaintiff's version of the facts, a jury could find that the officer

deliberately intended to do a wrongful act when there was evidence an officer

knew the plaintiff had not stolen any property from a gas station before the

officer decided to arrest him.  756 S.E.2d 204, 207 (Ga. Ct. App. 2014).

Here, too, a jury could find that Defendants knew they lacked authority to

enter the trailer because they had no evidence the suspect was inside or that a

burglary was taking place.  While Defendants argue that they did not know

Plaintiffs resided there, Georgia law states that the " 'deliberate intention to do

wrong' such as to constitute the actual malice necessary to overcome official

immunity must be the intent to cause the harm suffered by the plaintiffs."  See

Murphy, 647 S.E.2d at 60.  On the other hand, the cases do not instruct that the

officer must intend for a specific plaintiff to suffer that harm.  A jury could find

that Defendants intended to enter the trailer knowing they lacked a warrant or

exigent circumstances (a deliberate intention to do wrong), constituting a

trespass under Georgia law, which is the harm Plaintiffs argued they suffered.

Such a finding would constitute malice, thereby depriving Defendants of

official immunity.  Due to this factual dispute, Defendants' Motion for

Summary Judgment [44] and Plaintiff's Motion for Summary Judgment [43] as

to the trespass claim under Georgia law are **DENIED**.

## V.     ADA Claim (Count Six)

Turning to the final remaining claim, Plaintiff Black sues Sheriff

Wigington in his official capacity under the ADA.  Black alleges that Sheriff

Wigington discriminated against him by denying him the same privileges as

other inmates due to his disability and refusing to accommodate him.  (Compl.,

Dkt. [1] ¶¶ 54-55.)

Title II of the ADA prohibits discrimination in the delivery of public

services on the basis of disability.  Specifically,

> [N]o qualified individual with a disability shall, by reason of such
> disability, be excluded from participation in or be denied the
> benefits of the services, programs, or activities of a public entity,
> or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  Furthermore, "[t]he Supreme Court has instructed that a

disabled prisoner can state a Title II–ADA claim if he is denied participation in

an activity provided in state prison by reason of his disability." Bircoll v.

Miami-Dade County, 480 F.3d 1072, 1081 (11th Cir. 2007) (citing Pa. Dep't of

Corr. v. Yeskey, 524 U.S. 206, 211 (1998)).  For example, "[m]odern prisons

provide inmates with many recreational 'activities,' medical 'services,' and

educational and vocational 'programs,' all of which at least theoretically

31

'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')."  Yeskey, 524 U.S. at 210.

Defendants assert two main arguments in favor of summary judgment on Black's ADA claim: (1) Eleventh Amendment immunity bars the claim; and (2) Black fails to establish a prima facie case of disability discrimination.

A.     Eleventh Amendment Immunity

As a threshold matter, Defendants contend that the ADA claim against Sheriff Wigington in his official capacity is barred by Georgia's immunity under the Eleventh Amendment.  See Monell v. Dep't of Social Servs., 436 U.S. 658, 690 n.55 (1978) (noting that suits against officers in their official capacities "generally represent only another way of pleading an action against an entity of which an officer is an agent").  Black responds that Congress abrogated Georgia's Eleventh Amendment immunity by passing the ADA, and so he may maintain a suit against Sheriff Wigington in his official capacity.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST.

32

amend. XI.  Eleventh Amendment immunity extends to state agencies and

departments, <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 100

(1984), as well as any state official sued in his official capacity.  <u>Brandon v.

Holt</u>, 469 U.S. 464, 472-73 (1985); <u>Jackson v. Ga. Dep't of Transp.</u>, 16 F.3d

1573, 1577 (11th Cir. 1994).  Thus, neither a state nor its agencies, departments,

or officials are subject to suit unless: (1) the State unequivocally consents to suit

or (2) Congress has clearly expressed intent to abrogate a State's Eleventh

Amendment immunity with respect to rights protected by the Fourteenth

Amendment.  <u>Pennhurst</u>, 465 U.S. at 99.

The Supreme Court has held that "insofar as Title II creates a private

cause of action for damages against the States for conduct that *actually* violates

the Fourteenth Amendment, Title II validly abrogates state sovereign

immunity."  <u>United States v. Georgia</u>, 546 U.S. 151, 159 (2006).  Defendants

argue that the ADA abrogates Eleventh Amendment immunity *only* when the

alleged conduct violates both Title II and the Fourteenth Amendment but not

when the conduct violates Title II without violating the Fourteenth Amendment.

However, in <u>Georgia</u> the Supreme Court left that question open in its

instructions on remand:

33

> Once [the plaintiff's] complaint is amended, the lower courts will be best situated to determine in the first instance, on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

Id.

In any event, the Court finds that irrationally preventing disabled persons from accessing activities and services in prisons would independently violate both the Fourteenth Amendment's Equal Protection Clause and Title II. See Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 366-67 (2001) (finding that legislation affecting disabled persons receives rational-basis review under the Equal Protection Clause); 42 U.S.C. § 12132 (preventing discrimination in state services, programs, and activities). Thus, if Black can show that Defendants violated both Title II and, independently, the Fourteenth Amendment, then Georgia's mandate is satisfied and the Court need not decide whether Congress's purported abrogation of sovereign immunity as to conduct violating Title II but not the Fourteenth Amendment is nevertheless valid.

34

B.      Prima Facie Case of Discrimination under the ADA

The Court must next address Defendants' contention that they did not discriminate against Black and that none of the conduct Black alleges amounted to a constitutional violation.  To prove a claim under Title II of the ADA, a plaintiff must establish: (1) that he is a qualified individual with a disability; (2) that he was excluded from the participation in or denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such entity; (3) by reason of such disability.  Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001).

Defendants insist that Black is not a qualified individual with a disability, arguing that there is no evidence to demonstrate that Black was disabled for the purposes of the ADA.  (See Defs.' Br., Dkt. [44-1] at 31-32.)  "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  While the definition uses the words "eligibility" and "participation," this provision applies equally to prisons because these terms " 'do not connote

35

voluntariness' and do not require voluntariness on the part of an applicant who seeks a benefit from the state." Bircoll, 480 F.3d at 1081 (quoting Yeskey, 524 U.S. at 211).

The ADA defines "disability" as (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." Id. § 12102(2)(A). To ensure expansive coverage under the ADA, Congress enacted the ADA Amendments Act of 2008 ("ADAAA") to overturn Supreme Court decisions that "created an inappropriately high level of limitation necessary to obtain coverage under the ADA."[3] Pub. L. No. 110-325, 122 Stat. 3553 (2008)

---

[3]Specifically, Congress rejected the Supreme Court's requirement in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), that courts take into account the corrective effects of mitigating measures when considering whether an impairment substantially limits a major life activity. Id. at 482-83. Congress also rejected the holding of Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002), which required that the terms "substantially" and "major" "be interpreted strictly to create a demanding standard for qualifying as disabled" such that "an individual must have an

AO 72A
(Rev.8/82)

(codified as amended in scattered sections of 42 U.S.C.).  The ADAAA

therefore "reinstat[ed] a broad scope of protection to be available under the

ADA."  Id. (codified at 42 U.S.C. § 12102(4)(A)).  Accordingly, the definition

of "disability" must be construed "to the maximum extent permitted by the

terms of [the ADA]."  Id.  The term "substantially limits" must also be

construed broadly.  42 U.S.C. § 12102(4)(B).

In interpreting these provisions of the ADA, "courts may rely upon the

regulations promulgated by the Equal Employment Opportunity Commission

("EEOC") for guidance."  Gordon v. E.L. Hamm & Assocs., Inc., 100 F.3d 907,

911 (11th Cir. 1996) (citing 42 U.S.C. § 12116).  According to the EEOC, a

physical impairment is "[a]ny physiological disorder or condition, cosmetic

disfigurement, or anatomical loss affecting one or more body systems, such as

neurological, musculoskeletal, special sense organs, respiratory (including

speech organs), cardiovascular, reproductive, digestive, genitourinary, immune,

circulatory, hemic, lymphatic, skin, and endocrine."  29 C.F.R. § 1630.2(h)(1).

"An impairment need not prevent, or significantly or severely restrict, the

---

impairment that prevents or severely restricts the individual from doing activities that
are of central importance to most people's daily lives."  Id. at 197-98.

individual from performing a major life activity in order to be considered substantially limiting." Id. § 1630.2(j)(1)(ii).  The EEOC also makes clear that "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." Id. § 1630.2(j)(1)(iii).

The ADAAA has also dispensed with the requirement that courts consider the duration of an impairment when weighing whether it substantially limits a major life activity.  Under the ADAAA regulations, "effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section."[4]  29 C.F.R. § 1630.2(j)(1)(ix).  Consequently, the fact that an impairment might only last a few months is not dispositive.

Having reviewed the record, the Court finds that there is a dispute of material fact regarding whether Black was disabled.  Contrary to Defendants' assertions, there is evidence that Black was unable to walk without crutches due to his injury from slipping and falling.  Black states he stayed on the crutches

---

[4]For the "regarded as" prong of the definition of disability, there is an exception for "transitory and minor impairments," with "transitory" defined as "lasting or expected to last six months or less."  29 C.F.R. § 1630.15(f).  However, this exception expressly does not apply to the "actual disability" prong or the "record of disability" prong.  Id. § 1630.2(j)(1)(ix).

38

the entire time he was in jail.  (Black Aff., Dkt. [43-16] ¶ 6.)  Furthermore,

Black was unable to sleep because of his back pain.  This difficulty continued

throughout his time in jail and for about two months after.  (Id. ¶ 7.)  Thus,

Black has produced evidence that he had a physical impairment substantially

limiting one or more major life activities, including walking and sleeping.  He

therefore satisfies the disability prong of his ADA claim.

As for the second and third elements of Black's prima facie case, he must

produce evidence that he was excluded from the participation in or denied the

benefits of the services, programs, or activities of the jail, and that such

discrimination was due to his disability.  See Shotz, 256 F.3d at 1079.  Black

argues that he was discriminated against because he was not placed in the most

appropriate integrated setting.  Quoting Henderson v. Thomas, 913 F. Supp. 2d

1267 (M.D. Ala. 2012), Black argues:

> Among the regulations promulgated under Title II of the ADA is
> the "integration regulation," which provides that, "A public entity
> shall administer services, programs, and activities in the most
> integrated setting appropriate to the needs of qualified individuals
> with disabilities.  28 C.F.R. § 35.130(d) (emphasis added).  "[T]he
> most integrated setting appropriate" is defined as "a setting that
> enables individuals with disabilities to interact with non-disabled
> persons to the fullest extent possible."  28 C.F.R. Pt. 35, App. B
> (2011).  Consonant with the integration mandate, the Supreme

> Court has concluded that, "Unjustified isolation . . . is properly regarded as discrimination based on disability." <u>Olmstead v. L.C. ex rel. Zimring</u>, 527 U.S. 581, 597, 119 S. Ct. 2176, 144 L. Ed. 2d 540 (1999).

<u>Id.</u> at 1287-88.

Defendants assert that they did not violate Plaintiff's ADA rights because he failed to request an accommodation, Defendants had no duty to provide Plaintiff with special supplies or personal services, and Plaintiff was not denied access to showers or other standard jail amenities.  (<u>See</u> Defs.' Resp., Dkt. [52] at 5-11.)  First, while Defendants argue that there is no evidence in the record that Black ever made a request for an accommodation, Black states in an affidavit that he "asked a number of times to be move[d] from the cell [he] was in," and he "asked all the jail personnel above corporal that [he] saw for [some] exercise."  (Black Aff., Dkt. [55] ¶¶ .)  Evidently, jail officials never took any action.

Next, Defendants state that Title II "does not require a public entity to provide to individuals with disabilities personal devices, such as wheelchairs; individually prescribed devices, such as prescription eyeglasses or hearing aids; readers for personal use or study; or services of a personal nature including

40

assistance in eating, toileting, or dressing." 28 C.F.R. § 35.135. Defendants

further argue that the ADA requires only reasonable accommodation, not

"special treatment to which Plaintiff claims entitlement." (Defs.' Resp., Dkt.

[52] at 7-8.) Be that as it may, the bulk of Black's ADA claim focuses not on

special requests for additional amenities but on not being placed in the most

appropriate integrated setting.

Still, Defendants point out that he was not denied access to standard jail

amenities like showers. Indeed, while Black had to go ask for a deputy's

permission to shower and then had to walk farther down the hall to reach the

showers, he was not denied access to showers. As for access to television,

Defendants point out that inmates do not have a constitutional right to watch

television. See, e.g., Scheanette v. Dretke, 199 F. App'x 336, 337 (11th Cir.

2006). But the gravamen of Plaintiff's claim is not that he was denied access to

television but that because of his disability he was confined, albeit for medical

supervision, alone in a booking cell away from the general population, thereby

depriving him of access to activities and benefits other prisoners enjoyed.

These benefits included the opportunity to associate with other people in the

41

general population, to go outside for exercise,[5] and to watch television like other inmates.  (See Black Aff., Dkt. [43-16] ¶¶ 8-9.)  Indeed, a jail official acknowledged that there were privileges in the general population that were unavailable to Black, such as television and the ability to walk around and get out of his cell.  (See Jones Depo., Dkt. [43-11] at 22:1-12.)  And, highlighting that Black's segregation was on account of his disability, the jail official also explained that inmates who were going to be in the medical unit "for a long period of time" were put in certain larger cells or, if those cells were occupied, in a booking cell.  (See id. at 13:15-14:6.)

Defendants do point to evidence that Black was afforded the opportunity to exercise nearly every other day, however.  (See Defs.' Resp., Dkt. [52] at 10.)  Yet Black disputes this contention, stating, "I never had an opportunity to go outside of the jail for outdoor exercise during the entire time I was there." (Black Aff., Dkt. [43-16] ¶ 9.)  In view of this testimony, the Court finds that there is a factual dispute as to whether Black was placed in the most appropriate

-------

[5]Given Plaintiff's injury, he acknowledges he might not have exercised if permitted outdoors, but he "would have liked some fresh air and sunshine."  (Black Aff., Dkt. [43-16] ¶ 9.)

AO 72A
(Rev.8/82)

integrated setting or was excluded from the participation in or denied the

benefits of the services, programs, or activities of the jail due to his disability.

Moreover, Defendants have not suggested reasons why there would be a

rational basis for denying Black the ability to interact with other inmates or go

outside because of his injury.  A jury could thus find that the jailers irrationally

discriminated against Black, and as the Court previously explained, it is

irrational disability discrimination which the Fourteenth Amendment prohibits.

Thus, Black's ADA claim overlaps with the Fourteenth Amendment's Equal

Protection Clause.  As the Supreme Court held in Georgia, Congress's

abrogation of Eleventh Amendment immunity is valid as to these types of

claims.  See 546 U.S. at 159.

In sum, Black has produced evidence that he is a qualified individual

with a disability under the ADA.  Moreover, the Court finds that there remain

disputes of material fact as to whether Black was denied benefits of the

services, programs, or activities of the jail due to his disability.  Finally, because

irrationally denying these benefits to disabled persons would violate the

Fourteenth Amendment and the ADA independently, the abrogation of the

state's Eleventh Amendment immunity is valid and the Court need not address

whether Black could maintain an ADA claim for some other conduct not

violating the Fourteenth Amendment.  Due to these factual disputes,

Defendants' Motion for Summary Judgment [44] and Plaintiffs' Motion for

Summary Judgment [43] are **DENIED** as to Count Six.

**Conclusion**

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment [43]

is **DENIED**, and Defendants' Motion for Summary Judgment [44] is

**GRANTED in part** and **DENIED in part**.  It is **GRANTED** as to Counts One,

Three, and Seven, and it is **DENIED** as to all other claims.  Finally, Defendant

Tom Eaton is hereby **DISMISSED** from this action. The parties shall submit a

proposed consolidated pretrial order within 30 days of the entry of this Order.

**SO ORDERED**, this   4th   day of February, 2015.


**RICHARD W. STORY**
United States District Judge


44